UNITED STATES *v.* RAGEN.*

No. 54. Argued December 11, 1941.—Decided January 5, 1942.

*Together with No. 55, *United States* v. *Arnold W. Kruse,* and No. 56, *United States* v. *Lester A. Kruse,* also on writs of certiorari, 313 U. S. 557, to the Circuit Court of Appeals for the Seventh Circuit.

514

*Mr. Gordon B. Tweedy,* with whom *Assistant Solicitor General Fahy, Assistant Attorney General Clark,* and *Mr. Arnold Raum* were on the brief, for the United States.

*Mr. John L. McInerney,* with whom *Messrs. Matthias Concannon* and *Sidney R. Zatz* were on the brief, for respondent in No. 54.

*Mr. Joseph A. Struett,* with whom *Messrs. George K. Bowden* and *Warren Canaday* were on the brief, for respondents in Nos. 55 and 56.

Mr. Justice Black delivered the opinion of the Court.

Section 145 of the Revenue Act of 1932 provides that "any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the pay-

ment thereof, shall, in addition to other penalties provided by law, be guilty of a felony . . ." 47 Stat. 217. (There are identical provisions in the Revenue Acts of 1934 and 1936. 48 Stat. 725; 49 Stat. 1703.) Petitioners were indicted, tried, and convicted in the District Court for conspiracy to violate, and for violation of, this provision. The Circuit Court of Appeals, one judge dissenting, reversed. *United States* v. *Molasky,* 118 F. 2d 128. Because questions of importance in the enforcement of this criminal statute and the administration of the revenue laws were raised, we granted certiorari. 313 U. S. 557.

In computing net corporate income subject to tax, a deduction is permitted for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered . . ." § 23 (a), Revenue Acts of 1932, 1934, and 1936. 47 Stat. 179; 48 Stat. 688; 49 Stat. 1658. "Dividends" distributed from net corporate profits are not allowable deductions. But "commissions," if incurred as necessary business expenses and as a reasonable allowance for personal services actually rendered, are deductible from gross income. The larger the allowable deduction the smaller are the net taxable income and the tax imposed. The first four counts of the indictment set out attempts by the defendants to evade income taxes of the Consensus Publishing Company for the years 1933 to 1936, through a fraudulent scheme whereby, under the guise of paying commissions which were deducted from gross income, the corporation distributed dividends deduction of which the statute does not permit. The fifth count sets out a conspiracy to accomplish similar results for the years 1929 to 1936.

After an examination of the evidence in the record, including numerous exhibits, we are satisfied that the

jury could justifiably have found the following facts to be true:

The Consensus Publishing Company, an Illinois corporation, was organized in 1929 to carry on the business of preparing "run-down" sheets, daily bulletins containing information on horse racing, and selling them to bookmakers. The original stock ownership was distributed among Arnold Kruse (20 shares), James Ragen, Sr. (20 shares), William Molasky (30 shares), and Cecelia Investment Company (30 shares), a holding company controlled by Moses Annenberg, the dominant figure in several other corporations which were engaged in enterprises connected with betting on horse races. Kruse and Ragen were executives in other Annenberg companies. Molasky alone lived in St. Louis, where Consensus conducted its principal business operations, but he delegated to one Gordon Brooks, an employee of another corporation owned by Molasky, the job of collecting receipts, preparing records and reports, and supervising printing for Consensus,—work which took Brooks an hour-and-a-half a day on the average, except for the one day each week when the preparation of operating reports for the Chicago office required about three hours.

For several years Consensus made a weekly distribution of money to its shareholders in direct proportion to their holdings. In the period covered by the indictment, only the 30% of the distribution going to Cecelia Investment Company was treated as dividends in Consensus' tax returns. The remaining 70%, although referred to in some of the corporation's confidential weekly reports to stockholders during the period as "dividends," was nevertheless in its income tax return deducted from gross income as "commissions." The deductions thus claimed were $10,761 in 1929, $62,961 in 1930, $64,791 in 1931, $57,255 in 1932, $54,538 in 1933, $60,172 in 1934, $76,714 in 1935, and $119,756 in 1936. The book-

keeping system, under which 70% of the funds remaining after payment of expenses was charged as commissions, was set up in 1929 in accordance with instructions from Arnold Kruse.

In 1934, Kruse, having learned of a decision of the Board of Tax Appeals that distributions of profits as commissions would not be allowed as a deductible expense if made in accordance with stockholdings, set in motion a series of transactions retroactively modifying the relationship between Consensus and its stockholders. He directed an employee to destroy the original stock book of the company, issue new stock certificates bearing the date of incorporation (September 18, 1929), and then immediately to cancel the new certificates and issue a single certificate for one hundred shares to the Cecelia Investment Company. In 1935 or 1936, Kruse ordered the drawing up of written yearly contracts of employment for the several years from 1930 on between Consensus and the individuals to whom "commission" payments had since the inception of the company been made. In each contract, the compensation was to correspond identically with the amount that had already actually been paid.

Except for delays in destroying the original stock book and the original stock certificates, this plan was promptly carried out. Moreover, corporate minutes were drawn up, appropriately back dated, which set out the stock "issue" and the employment contracts as if they were actual events contemporaneous with the false dates of recording.

Among the back-dated contracts were several between Consensus and the respondent Lester Kruse, son of Arnold. These together with a back-dated assignment by Arnold to Lester of his "contract of employment" with Consensus were to afford ostensible documentation of a shift to Lester, after March, 1933, of the share that had formerly

gone to Arnold.[1]  Similarly, after 1931, Consensus paid the share that had formerly gone to Ragen to Ragen's son. Here, too, a set of back-dated papers documenting the shift was fabricated.  After their sons became the nominal recipients of commissions, Kruse and Ragen continued to be connected with the affairs of Consensus.  Kruse, for example, directed the creation of the spurious papers and records already described, and Ragen from time to time, at least until 1935, signed "commission" checks of Consensus which were paid in regular course.[2]

If, from the foregoing and other supporting evidence in the record, the jury could have found that any one of the defendants had, with the intentional coöperation of the others, received "commissions" without rendering any services whatsoever, it would have been possible for the trial judge to have submitted the case to the jury without calling upon it to decide any questions of reasonableness of compensation for services actually rendered.  If, however, each defendant had performed some service for the corporation, the jury would have had to consider whether or not the "commissions" had intentionally been made excessive so that a portion of payments made in the guise of meeting expenses actually constituted a distribution of dividends.  There was evidence which, if believed, tended to establish that each defendant had performed some service, although of an irregular and undefined nature. Hence, it seems to us entirely proper for the trial judge to have submitted the case to the jury with a charge not necessarily calling for a determination of whether all or

---

[1] Or to his wife.  From August, 1932, to March, 1933, Consensus distributed 20% of its earnings to Mrs. Arnold Kruse.  No explanation is apparent in the record.

[2] Because of this and other circumstances showing Ragen's continued participation in the affairs of Consensus, we conclude that the argument, separately made on his behalf, that there was insufficient evidence to establish his connection with any scheme to evade taxes, is without merit.

none of the "commissions" paid to each defendant were dividends, but permitting a determination of whether the "commissions" were intentionally made to *include* substantial amounts which should have been treated as dividends. Upon such a charge,[3] the jury found Arnold Kruse and Ragen guilty on all five counts, and Lester Kruse guilty on counts four and five.[4]

---

[3] The crucial portions of the District Judge's charge to the jury are as follows:

"If these sums distributed were distributed as a part of the profits of the corporation, then they should have been accounted for in the income tax report of the Consensus Company as profits and upon that the corporation should have paid a tax, which it did not.

"If, on the other hand, they were intended to and represented actual bona fide compensation to employes of this corporation in the ordinary operation of its business; in other words, if they were ordinary and necessary expenses of the operation of the business, then they were properly deductible as they were deducted and no tax was due upon them.

.    .    .    .    .

We are concerned only with the question of whether these men have entered into a conspiracy, into a scheme whereby as a result this corporation, the Consensus Company, under the guise of commissions, distributed to its shareholders sums that actually represented a division of profits.

"If these defendants had that kind of plan and carried it out, if they wilfully and intentionally entered into such an arrangement, there wouldn't be any question of their guilt.

.    .    .    .

It is not necessary for the government under this indictment to prove that all of the sums so distributed to these defendants were profits. It is not necessary that the government prove all of the figures precisely as they are charged in the indictment. It is sufficient if you find beyond a reasonable doubt that the defendants intentionally diverted profits of this concern, in the amounts charged in the indictment or substantial parts thereof, diverted them from the form of profits and received them in the form of commissions."

[4] Molasky, James Ragen, Jr., and the Consensus Publishing Company were also found guilty. The government has not sought review of the Circuit Court of Appeals reversal of the conviction of Molasky

In the charge as given, the Circuit Court of Appeals found reversible error. The gist of the court's argument is contained in the following excerpt from the opinion:

"We have reached the conclusion that where a statute permits a reasonable deduction for services, a criminal prosecution can not be maintained by proof other than that such services were not rendered. It is not sufficient to allege or prove that a deduction claimed for services is unlawful because the amount charged is unreasonable. Such a charge would leave to the trier of the facts the responsibility for fixing the standard by which a defendant's guilt would be determined. The standard would vary according to the views of different courts and juries. Such a theory would be violative of the defendant's constitutional rights, and void. *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81 . . .; *International Harvester Co.* v. *Kentucky*, 234 U. S. 216, 221 . . .; *Collins* v. *Kentucky*, 234 U. S. 634, 638 . . ."[5]

Determination of allowable deductions by reference to a standard of "reasonableness" is not unusual under federal income tax laws. For example, the deductions allowed for depreciation and obsolescence, for bad debts, and for ordinary and necessary business expenses (other than compensation for services) are designated in the Internal Revenue Code as "reasonable." 53 Stat. 1, §§ 23 (1), 23 (k) (1), 23 (a) (1). If, as the opinion below suggests, the only question that can properly be submitted to the jury is whether the *entire* deduction is fabricated, an unconscionable taxpayer can immunize himself from the criminal sanctions for tax evasion by the simplest of expedients. He need only find a legitimate item of deduction and then pad it as much as his purpose

---

and James Ragen, Jr., which involved additional issues of no relevance to the respondents here. The corporation did not take an appeal from the judgment of the District Court.

[5] *United States* v. *Molasky, supra*, 118 F. 2d at 139.

requires. By transforming the question "Should any deduction have been made?" into "Was the deduction made in excess of a reasonable allowance?" he can, if the theory accepted below be correct, largely destroy the deterrent effect of a penal statute passed by Congress.

We have concluded, however, that the ground of decision below is untenable. The mere fact that a penal statute is so framed as to require a jury upon occasion to determine a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct. Cf. *Nash* v. *United States,* 229 U. S. 373. The cases cited by the Court of Appeals affirm no such proposition. In the *Cohen Grocery* case, this Court held a conviction under § 4 of the Lever Act, 41 Stat. 297, 298, unconstitutional because the statute left open "the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against," and because an "attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury." *United States* v. *Cohen Grocery Co., supra,* 89. In the *International Harvester* case, this Court expressed the view that assurance that the state statute there in issue was complied with called for "gifts that mankind does not possess." *International Harvester Co.* v. *Kentucky, supra,* 224. And in the *Collins* case, the same statute was said to call for a determination of conduct "not according to the actualities of life, or by reference to knowable criteria, but by speculating upon imaginary conditions." *Collins* v. *Kentucky, supra,* 638.

No such unworkable standards are involved here. Section 145 of the Revenue Act of 1932, standing alone, is not vague nor does it delegate policy-making powers to

either court or jury. It declares that "any person who willfully attempts in any manner to evade or defeat any tax imposed" by the act "shall . . . be guilty of a felony" and specifies penalties in addition to those otherwise provided by law. That such acts of bad faith are not beyond the ready comprehension either of persons affected by the act or of juries called upon to determine violations need not be elaborated. Nor does the particular mode of evasion here alleged, intentional deduction of dividends in the guise of compensation for personal services, so transform the nature of the offense as to make the actors less aware that they are committing it or juries less competent to detect it. The statutory specification of permissible deduction here in question is of long standing. For years, thousands of corporations have filed income tax returns in accordance with the direction to deduct "a reasonable allowance for salaries or other compensation for personal service actually rendered," and there has not been any apparent general confusion bespeaking inadequate statutory guidance. A finding of unconstitutional uncertainty in this section of the act, as applied here, would be a negation of experience and common sense.

On no construction can the statutory provisions here involved become a trap for those who act in good faith. A mind intent upon willful evasion is inconsistent with surprised innocence. Cf. *Gorin* v. *United States,* 312 U. S. 19; *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497; *Omaechevarria* v. *Idaho,* 246 U. S. 343. And the charge given by the trial court amply instructed the jury that scienter is an essential element of the offense.

We conclude that it was not error to submit to the jury the question of whether or not the respondents attempted to make unreasonable allowances for personal services. The respondents, however, raise a further objection going not to the propriety of such a submission as a matter of law, but to the insufficiency of the evidence upon which

the jury could have found an answer to the question submitted.  They contend that the record discloses that the recipients of commissions performed some services; that the record fails to show that the services disclosed were the only services rendered; that there was no direct testimony as to the total amount of services rendered or the reasonable value thereof; and that, therefore, the jury had no rational basis upon which to conclude that the sums deducted as "commissions" were more than a reasonable allowance for compensation for the services rendered. We must reject this contention.

The business conducted by Consensus, a business which, according to the testimony of a person who was in immediate charge of its major operations, normally required only an hour and a half daily of managerial supervision, would hardly seem to call for additional executive services worth what Consensus paid in "commissions."  The same witness testified that he had never seen some of the recipients of "commissions," and that his only contact with one of them was two telephone conversations.  This testimony, too, belies participation by the respondents in the business activities of Consensus to a degree justifying payment of the high "commissions"—equal on the average to about half of gross revenues and amounting each year to several times all other wages and salaries [6]—as a *quid pro quo* for their services.  Moreover, there is the additional circumstance, damaging to the respondents' contention that, year in and year out, 30% of earnings after deduction of expenses was paid to the Cecelia Investment Company as dividends, and 70% to the respondents or other individuals as "commissions."  This uniformity in the computation of "compensation" is difficult to reconcile with the variations in extent and kind of personal services which

---

[6] In 1936, for example, "commissions" amounted to $119,756 as compared with $8,816 paid out for other wages and salaries.

one would expect to find in accounts reflecting bona fide allowances for personal services. Further, there is the circumstance that the "commission" payments were always in proportion to original stock holdings. And darkening the whole picture is the atmosphere of purposeful concealment evinced by the destruction of some important corporate papers and the fabrication of others. We are convinced that all of this is sufficient to support a finding by the jury that the respondents willfully attempted to make unreasonable allowances for personal services.

The respondents also urge that there was a fatal variance between the indictment and the proof, in that the indictment alleges that the commission payments were actually dividends in their entirety, whereas the evidence indicates that some services were performed. The fifth count of the indictment does refer to "all of the moneys . . . paid . . . by virtue of the . . . so-called 'Employment Contracts' " as "in truth and in fact, distributions of profits and dividends." But the gravamen of the charge is distribution of dividends in the guise of commissions, and the respondents cannot fairly claim that they were not adequately apprised of the nature of the offense. Any variance which existed, at most a matter of the extent of the alleged tax evasion, involves no elements of surprise prejudicial to the respondents' efforts to prepare their defense. Cf. *Berger* v. *United States,* 295 U. S. 78; *Bennett* v. *United States,* 227 U. S. 333.

The respondents have made further contentions which we conclude, after consideration, are without merit.

The judgment of the Circuit Court of Appeals is reversed and that of the District Court affirmed.

*Reversed.*

MR. JUSTICE ROBERTS, MR. JUSTICE MURPHY, and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.